Filed 4/14/21  P. v. Murray CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>   v.<br><br>JORDAN MURRAY,<br><br>      Defendant and Appellant. | C090706<br><br>(Super. Ct. No. LOD-CR-FDV-2018-0011126) |

This case involves a shooting in a Walmart parking lot during a domestic dispute that resulted in the death of a dog.  A jury found defendant Jordan Murray guilty of assaulting his former girlfriend, A.W., with a firearm (Pen. Code, § 245, subd. (a)(2)),[1] making a criminal threat to A.W. and her mother, Nicole Dalton (§ 422, subd. (a)), cruelty to an animal (§ 597, subd. (a)), discharging a firearm in a grossly negligent

---

[1] Undesignated statutory references are to the Penal Code.

1

manner (§ 246.3, subd. (a)), vandalism (§ 594, subd. (b)(2)(A)), and false representation of identity to a peace officer (§ 148.9, subd. (a)).[2] The jury also found true the firearm enhancement allegations. (§§ 12022.5, subd. (a), 12022.53, subd. (c).) The trial court sentenced defendant to an aggregate term of nine years four months in prison. This timely appeal followed.

On appeal, defendant contends, and the People concede, that his conviction for making a criminal threat to Dalton (count 5) must be reversed due to insufficient evidence. Defendant further contends that reversal is required due to instructional error and prosecutorial misconduct. We will reverse defendant's conviction on count 5, vacate his sentence, and remand for resentencing. In all other respects, we will affirm the judgment.

## FACTUAL BACKGROUND

*The Shooting*

In September 2018 defendant and A.W. were 20 years old. The couple had been in a relationship for years and had two young children. A.W. and her mother (Dalton) were using methamphetamine and defendant was concerned about how A.W.'s drug use was affecting her ability to care for their children. Defendant had recently lost his job and was depressed and taking Xanax. A few months earlier, defendant and A.W. "lost" their apartment and had, for the most part, been sleeping in a car with their children ever since. The couple also had an "open CPS case."

In the afternoon of September 2, 2018, A.W. told defendant that she wanted to take a "break" from their relationship. According to Dalton, defendant seemed very

---

[2] The jury was unable to reach a unanimous verdict on the counts charging defendant with the willful, deliberate, premeditated attempted murder of A.W. (§§ 187, sub. (a), 664) and assaulting Dalton with a firearm (§ 245, subd. (a)(2)). These counts were dismissed at the prosecutor's request after the trial court declared a mistrial.

2

upset and was pleading with A.W. to stay with him.  At that time, A.W. had been staying with Dalton or friends for about two weeks.  According to defendant, A.W. kept leaving him "to go smoke dope with [Dalton]" and didn't "give a fuck about [their kids]."

Later that same day, Dalton and A.W. decided to go to the Walmart in Lodi. Dalton drove her Lincoln Navigator and A.W. rode in the front passenger seat. Defendant, who was invited by Dalton to go along with them, followed behind the Navigator in his car.

The group arrived at Walmart around 8:50 p.m.  Shortly thereafter, defendant and A.W. got into an argument in the parking lot.  During the argument, Dalton got out of the Navigator, walked around the back to the passenger side, and stopped near the rear tire. At that moment, defendant was holding a shotgun at waist-level and A.W. was standing in the middle of the Navigator, next to the handle of the front passenger side door. According to Dalton, defendant was "kind of like desperate"; he was "pleading" and "demanding" that A.W. go with him "because of the kids."  When A.W. refused, defendant pointed the shotgun at her and said that he was "going to blow her head off" if she did not get in his car.[3]  In response, A.W. dropped to her hands and knees.[4] Immediately thereafter, defendant fired the shotgun.  A.W. quickly crawled away and

---

[3] On cross-examination, Dalton acknowledged that the police report indicated that she heard defendant tell A.W., "Come with me or I will blow your brains out."  When asked if she heard defendant say, "Come with me or I will blow your brains out," Dalton responded, "Blow your head off."

[4] There was conflicting evidence as to whether A.W. dropped to the ground before or after defendant fired the shotgun.  In her police interview, A.W. indicated that she dropped to the ground before the shot was fired.  However, she later told a defense investigator that she heard a gun "go off" and then immediately ducked and ran away.  At trial, A.W. testified that she dropped to the ground after the shot was fired.

then got up and ran.  Dalton rushed toward defendant and screamed at him.  Defendant threw the shotgun into his car, got in, and drove away.[5]

According to Dalton, A.W. was about 12 feet away from defendant when he fired the shotgun and would have been hit by the blast had she not dropped to the ground.  The buckshot (i.e., little metal "BBs" or pellets) discharged from the shotgun blast struck the passenger side of the Navigator, shattering the rear passenger side window and causing damage to the rear passenger side door.  There were "little BB holes" and metal fragments inside the Navigator.  The holes were located above the driver's seat.  There was also damage above the rear driver's side door.  Neither A.W. nor Dalton was struck by the buckshot.

Shortly after the shooting, Dalton and A.W. drove away from the area without calling the police.  A few minutes later, Dalton discovered that defendant had shot and killed her dog Charlie, a 16-pound mixed terrier.  Prior to the shooting, Charlie had been in the backseat of the Navigator, on the passenger side.

*Dalton's Police Report and Defendant's Arrest*

A.W. begged Dalton not to report the shooting because she loved defendant and believed the shooting was an accident.  But approximately an hour after the shooting, Dalton drove to the Lodi Police Department and reported the incident, identifying defendant as the shooter.

A few hours later, defendant called Dalton while she was speaking with a police officer.  The call was recorded and played for the jury.  During the call, defendant did not appear to be happy with A.W. and called her several names.  When Dalton asked

---

[5]  A bystander who was in the Walmart parking lot at the time of the shooting testified that he heard a gunshot and then yelling back and forth between a man and woman.  The bystander heard a woman say, "Jordan stop it.  Jordan, no."  The bystander then saw the man get into a car and quickly drive off.

defendant for help in removing Charlie from the Navigator, defendant said he was about to go to sleep and would help her in the morning.[6]

When police officers located defendant the next morning, he was leaving an apartment with a woman, later identified as Lena Tracy. He was arrested shortly thereafter and placed in the back of a patrol car. He initially told a police officer that his name was "Roy." However, he later admitted his true name and that his brother's name is Roy.

*Defendant's Police Interview*

Defendant, who declined to testify at trial, was interviewed by a police officer on the same day as he was arrested. During the interview, which was recorded and played for the jury, he admitted that he was the shooter. He explained that he loved A.W. but did not like her, and that he just wanted A.W. to leave with him. He claimed that he shot at the Navigator, not A.W., and did not intend to shoot A.W. or hurt anyone. He described the shooting as a mistake but acknowledged that he "racked" a round (i.e., prepared the shotgun for firing) prior to getting out of his car and did not claim that he accidentally fired the gun. He explained that A.W. was running away from the Navigator at the time of the shooting; she was approximately 10 feet from him, near the front of the Navigator. When asked, he acknowledged that A.W. could have been hit by the buckshot discharged from the blast.

As for Dalton, defendant claimed that he never threatened her and did not point his gun at her, although he admitted that he was upset at Dalton because she had been providing A.W. with methamphetamine and he wanted to keep A.W. "away from all that." Defendant explained that he lost control of his emotions and shot at the Navigator

---

[6] Dalton testified that defendant repeatedly called her after the shooting. He was crying and very apologetic. He said that he loved her and A.W. and did not intend for the shotgun to "go off." He claimed that the shooting was an accident.

because he was angry and trying to "prove a point"; he wanted A.W. to come with him and get away from Dalton, "stop doing dope," and be a mother to their children. Defendant further explained that he was upset at the time of the shooting because A.W. had recently told him she liked a man named Travis and did not want to be with defendant anymore, and that he had recently been fired from his job because A.W. "took off and went to [Travis]," which "messed" with his emotions. Defendant also noted that A.W.'s conduct was the reason why they "lost" their apartment, and that A.W. did not "give a fuck" about their kids; she did not help take care of them, she just yelled and screamed at them. Defendant mentioned that Travis had sent him some threatening text messages but did not indicate that Travis was at the Walmart parking lot at the time of the shooting.

When asked, defendant said that the shotgun used in the shooting belonged to him and was located at his mother's house. The shotgun was subsequently retrieved from that residence during execution of a search warrant.

*A.W.'s Police Interview*

A.W. was interviewed by the police three days after the shooting. The interview was recorded and played for the jury. The detective who conducted the interview testified that A.W. was emotional, anxious, and nervous. She "seemed reluctant" to be involved and to speak with him. At one point, she mentioned that she "didn't want to come to court on this matter." The detective interpreted her comment to mean that she did not want to participate in the prosecution of defendant.[7]

During the interview, A.W. claimed that defendant was a great dad, she was not afraid of him, and he did not threaten her prior to the shooting. She explained that she was talking to defendant and walking toward Walmart when she saw him pull out a gun.

---

[7] A.W. appeared at the preliminary hearing in this matter but left the courthouse before she was called as a witness.

She dropped to the ground and then heard a loud bang and saw "BBs." She claimed that, "realistically," defendant did not point a gun at her because she dropped to the ground when she saw him reach for something. When asked, A.W. indicated that she was near the front of the Navigator when the shotgun was fired.

As will become relevant, *post*, A.W. did not claim that a man named Travis was present at the time of the shooting or that Travis had threatened defendant. She only mentioned defendant when she spoke about the shooting and never indicated that the shooter was someone other than defendant or that Dalton had staged or set up the shooting. She also never mentioned plastic BBs or that Dalton was telling her what to say to law enforcement after the shooting.

*A.W.'s Defense Investigator Interview*

When A.W. was interviewed by an investigator from the public defender's office five months after the shooting, she said that defendant was at the Walmart parking lot on the night of the shooting. He was holding a gun and asked her to come with him. She explained that she heard a gun fire and immediately ducked and ran away. She claimed that defendant did not point a gun at her, and that she did not hear him say anything to her prior to the gun firing. She also claimed that she believed defendant did not intend to shoot her or Dalton.

*A.W.'s Trial Testimony*

A.W. gave a different account of the shooting at trial. She testified that a friend of Dalton's, Travis Nelson,[8] was at the Walmart parking lot on the night of the shooting, and that she heard what sounded like "fireworks going off," a "[r]oman candle." In response, she dropped to the ground, rolled, and then ran away. A.W. claimed that she

---

[8] Although not entirely clear, it appears that Travis Nelson is the same Travis mentioned by defendant during his police interview. For purposes of consistency and clarity, we refer to Travis by his first name.

did not see defendant at the Walmart parking lot on the night of the shooting. When asked, she denied that defendant had pointed a gun at her or fired a gun. A.W. further claimed that she saw plastic BBs on the night of the shooting, that the damage to Dalton's car looked "staged," that Dalton did not like defendant,[9] and that Dalton repeatedly told her defendant was at the shooting but she remembered Travis there.

A.W. explained that Travis had recently been released from prison and had threatened defendant. A.W. further explained that her memory of the day of the shooting was "foggy" because she was "on drugs back then." According to A.W., she and Dalton used methamphetamine together and Dalton wanted her to spend less time with defendant (who did not use methamphetamine), because Dalton was "concerned that [A.W.] was going to stop being with [her] and stop using drugs." A.W. also claimed that Dalton wanted her to say things to the police that were not true but provided no details in this regard.

## DISCUSSION

### I

### *Sufficiency of the Evidence*

Defendant contends, and the People concede, that his conviction on count 5 for threatening Dalton must be reversed due to insufficient evidence. We agree with the parties.

#### A. *Standard of Review*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the

---

[9] When Dalton testified, she acknowledged that she was upset with defendant for killing her dog but said that she loved defendant and did not "bear any ill will" toward him.

defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)

B. *Applicable Legal Principles*

In order to prove that a defendant committed the crime of making a criminal threat in violation of section 422, "the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228; see also *People v. Boles* (2020) 44 Cal.App.5th 935, 941-942; § 422, subd. (a).)[10] For purposes of section 422, an " 'immediate family' " member includes a child. (§ 422, subd. (b).)

---

[10] Section 422 provides: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal,

" ' " 'In construing a statute, our task is to determine the Legislature's intent and purpose for the enactment.  [Citation.]  We look first to the plain meaning of the statutory language, giving the words their usual and ordinary meaning.  [Citation.]  If there is no ambiguity in the statutory language, its plain meaning controls; we presume the Legislature meant what it said.  [Citation.] . . .' [Citations.]  We examine the statutory language in the context in which it appears, and adopt the construction that best harmonizes the statute internally and with related statutes." ' " (*People v. Zamarripa* (2016) 247 Cal.App.4th 1179, 1183.)

C.  *Analysis*

We agree with the parties that defendant's conviction on count 5 for making a criminal threat to Dalton must be reversed for insufficient evidence.  As the prosecutor conceded in closing argument, the evidence adduced at trial showed that the only person threatened in this case was A.W.  Dalton testified that defendant pointed a shotgun at A.W. and told her that he was going to "blow her head off" if she did not get in his car.  As relevant here, the crime of making a criminal threat requires the prosecution to prove that the defendant willfully threatened to commit a crime that would result in death or great bodily injury to another person, and that the threat actually caused *the person threatened* to be in sustained fear for his or her own safety or for his or her immediate family's safety.  (*People v. Toledo, supra*, 26 Cal.4th at pp. 227-228; see also § 422, subd. (a).)  Thus, because there is no evidence that defendant threatened Dalton, there was insufficient evidence to support the jury's verdict on count 5.  In response to defendant's motion for judgment of acquittal (§ 1118.1), the prosecutor erroneously

---

unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."  (§ 422, subd. (a).)

10

argued, and the trial court improperly concluded, that Dalton was threatened within the meaning of section 422 because she overheard the threat made to A.W. Based on the plain text of the statute, Dalton could not have been the victim of defendant's criminal threat. Although defendant threatened violence to Dalton's immediate family member (i.e., A.W.), *the person threatened* was A.W., not Dalton. The threat was not directed toward Dalton; it was directed toward A.W. (See *People v. Solis* (2001) 90 Cal.App.4th 1002, 1024 [making a criminal threat is "a crime of psychic violence which, if directed at separate listeners (victims) who each sustain fear, can be punished separately"].) Accordingly, we will reverse defendant's conviction on count 5, vacate his sentence, and remand for resentencing.[11] (See *People v. Eroshevich* (2014) 60 Cal.4th 583, 591 [retrial after reversal permitted except when evidence was insufficient].)

II

*Alleged Instructional Error*

Defendant contends his conviction for threatening A.W. (count 3) must be reversed because the trial court prejudicially erred in instructing the jury on the specific intent element of the offense, which relieved the prosecution of its burden to establish the elements of the offense beyond a reasonable doubt in violation of his constitutional rights to due process and a fair trial.[12] According to defendant, the trial court instructed the jury "in a manner that made it reasonably likely the jury would believe that the judge was

---

[11] Our Supreme Court has noted that "when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 893.)

[12] Defendant additionally contends that his conviction for making a criminal threat to Dalton (count 5) must be reversed due to prejudicial instructional error. However, because we will reverse defendant's conviction on this count for insufficient evidence, we need not and do not address his contentions in this regard.

telling them that one or more of the elements of the [offense] had been proven." We see no prejudicial error.

A. *Additional Background*

After closing arguments, the trial court orally instructed the jury. As relevant here, the trial court made the following remarks in connection with instructing the jury pursuant to CALCRIM No. 225 (Circumstantial Evidence: Intent or Mental State): "Three or four of the offenses you have [require] specific intent . . . . Attempted murder means you specifically attempted to murder someone and didn't accidentally do it . . . , you meant to do it. It wasn't an accident so the specific intent of the offenses have the same instructions. . . . [¶] The People must prove not only that the defendant did the acts charged but also that he acted with a particular specific intent and/or mental state in the following: [¶] Count 1, that's the attempted murder . . . . The allegation that any such attempted murder was willful, deliberate and premeditated. Obviously you have to have a specific intent to reach a conclusion on that. . . . *Count 3 and 5, the criminal threats, the law says that's specific intent. That's not an accident. When you say things like that, that meets the instruction.* . . . [¶] The elements required to prove these counts . . . , including the required acts, specific intent and/or mental state, are explained in the instructions in your packet. These elements, including any required acts, specific intent and/or mental state, may be proved by circumstantial evidence." (Italics added.) The trial court provided no further elaboration as to what it meant by its remarks as to the specific intent requirement for the criminal threat offense. Defense counsel did not object to the remarks.

Thereafter, the trial court orally instructed the jury on the elements of the criminal threat offense pursuant to the pattern instruction, CALCRIM No. 1300 (Criminal Threat). Prior to deliberations, the jury was given a written version of the same instruction. The trial court's oral and written instructions advised the jury that in order to find defendant guilty of making a criminal threat, it must conclude, among other things, that "defendant

12

willfully threatened to unlawfully kill or unlawfully cause great bodily injury to . . . [A.W.]," and that defendant "intended that his statement be understood as a threat and intended that it be communicated to the alleged victim." The jury was further instructed that, "Someone who intends that a statement be understood as a threat does not have to actually intend to carry out the threatened act . . . ."

The written instructions given to the jury also included an instruction pursuant to CALCRIM No. 225.

B. *Analysis*

Even were we to assume the trial court erred by orally instructing the jury that the specific intent element of the criminal threat offense had been satisfied, we would find the error harmless beyond a reasonable doubt. (*People v. Flood* (1998) 18 Cal.4th 470, 504-505 [instructional error removing an element of the crime from the jury's consideration is subject to harmless beyond a reasonable doubt prejudice standard under *Chapman v. California* (1967) 386 U.S. 18, 24.) The record reflects that the jury was properly instructed, orally and in writing, on the elements of the criminal threat offense pursuant to the pattern instruction, CALCRIM No. 1300. The jury was also properly instructed in writing pursuant to CALCRIM No. 225. The written instructions did not advise the jury that the specific intent element for the criminal threat offense had been satisfied. To the extent that the trial court's oral instructions conflicted with the written instructions, we presume the jury followed the written instructions. (*People v. Mills* (2010) 48 Cal.4th 158, 201.)

Further, in addition to the jury receiving correctly worded written instructions, the prosecutor did not argue or suggest the trial court had determined that the specific intent element of the criminal threat offense had been satisfied. Rather, he argued that this element had been proven because the evidence showed defendant threatened to "blow [A.W.'s] head off" if she did not get in his car, and then immediately fired the shotgun when she said no. The primary defense theory was that defendant did not point a gun at

13

A.W. or threaten her, which was based on the statements A.W. made after the shooting and her trial testimony,[13] as well as defendant's denial that he threatened A.W. In support of this theory, defense counsel argued that Dalton had fabricated the threat because she was mad at defendant for the shooting and killing her dog. Defense counsel did not alternatively argue that, even if defendant threatened A.W. as Dalton claimed, he did not make the threat with the specific intent that the statement be taken as a threat. Rather, defense counsel asserted that other elements of the offense were not satisfied. In finding defendant guilty of this offense, the jury did not believe A.W. Instead, the jury credited Dalton's testimony. At trial, Dalton clearly and unequivocally testified that she saw defendant point a shotgun at A.W. and say that he was going to "blow her head off" if she did not get in his car. This was the only evidence supporting the jury's finding that defendant made a criminal threat to A.W. Had the jury believed A.W., it would have acquitted defendant on this count.

Under the circumstances presented, we are convinced that any instructional error was harmless beyond a reasonable doubt. There is no rationale or plausible basis for finding that the asserted instructional error affected the jury's verdict. (*People v. Flood, supra*, 18 Cal.4th at p. 504 [in determining whether error was harmless beyond a reasonable doubt, we must ask whether we can say beyond a reasonable doubt that the error did not contribute to the jury's verdict].) No reasonable jury could have found that

---

[13] In closing argument, the prosecutor argued that "most of" what A.W. said during her testimony was a "lie to protect [defendant]." Defense counsel conceded that A.W. "mostly lied" during her testimony, noting that A.W. said some "outlandish stuff," some of which "squarely" contradicted her prior statements and the other evidence presented at trial, including her testimony that defendant was not at the Walmart parking lot on the night of the shooting. Defense counsel told the jury that A.W. was a "terrible liar" and her lying was "incredibly bad," but invited the jury "to consider that she did tell the truth about a couple of things at certain points in time." Specifically, he urged the jury to conclude that A.W. did not lie when she claimed defendant did not point a gun at her or threaten her.

14

defendant threatened A.W. as Dalton claimed, but concluded that he did not act with the requisite mental state to be guilty of making a criminal threat to A.W. within the meaning of section 422.

We find no merit in defendant's contention that the challenged remarks made by the trial court "likely" relieved the prosecution of its burden to prove all the elements of the criminal threat offense. A fair reading of the record reveals that the remarks only related to the specific intent element of the offense, and nothing the trial court said suggested that the other elements of the offense had been satisfied.[14] There is no reasonable likelihood that the jury understood the remarks in the manner suggested by defendant.

### III

### *Prosecutorial Misconduct*

Defendant contends the prosecutor committed prejudicial misconduct in closing argument by repeatedly asserting that he had sex with A.W.'s friend shortly after the shooting, which inflamed the passions of the jury against him and violated his constitutional right to due process.[15] Recognizing that trial counsel failed to object, defendant alternatively argues that an objection would have been futile and that counsel was ineffective for failing to object. We conclude that defendant has forfeited his claim of error and has failed to establish ineffective assistance of counsel.

---

[14] In view of our conclusion that defendant suffered no prejudice from the asserted instructional error, we reject defendant's related claim that trial counsel was ineffective for failing to object to the challenged remarks. Because we have addressed the merits of defendant's claim, we need not discuss his contention that the claim was not forfeited.

[15] Defendant additionally contends that the prosecutor committed prejudicial misconduct in closing argument by misstating the law with regard to the offense charging him with making a criminal threat to Dalton (i.e., count 5). However, we need not address this argument because we reverse defendant's conviction on count 5 for insufficient evidence.

A. *Additional Background*

The operative pleading charged defendant with nine crimes, including willful, deliberate, and premeditated attempted murder of A.W. and assaulting A.W. with a firearm. During his police interview, defendant said that he loved A.W. but did not like her, and that he needed to "go fuck other bitches." He explained that, after the shooting, he dropped the shotgun off at his mother's house and then contacted one of A.W.'s friends and asked her to pick him up. He told the officer who was interviewing him that "you don't wanna know what happened after." When the officer agreed, defendant laughed. The evidence adduced at trial showed that police officers observed defendant leaving an apartment on the morning after the shooting with a woman, later identified as Tracy.

In closing argument, the prosecutor argued the jury could infer that defendant possessed the requisite mental state to be convicted of attempted murder based on the circumstances of the offense and his conduct after the incident. As relevant here, the prosecutor noted that defendant quickly fled the scene after the shooting, stashed the shotgun at his mother's house, and then contacted A.W.'s friend (Tracy) and asked her to pick him up. The prosecutor noted that defendant, during his police interview, eluded to something that happened between him and Tracy that the officer did not "want to know about." The prosecutor then stated: "We can all gather what that means, specifically, probably had sex with her. He then calls up . . . Dalton in the middle of the night, several hours after, calls [A.W.] a fucking piece of shit, describes how she's the problem, that she gets him all heated." Shortly thereafter, the prosecutor referenced the portion of defendant's police interview where he indicated that he needed to "fuck other bitches," and then said, "Congratulations. Sounds like [defendant] did that right after [the shooting] happened . . . ." Later, the prosecutor stated: "What is the defendant's attitude . . . two [to] three after [the shooting] occurs, 'I'm sorry, bruh, about your dog.' That doesn't sound like you're sorry. 'I know that dog meant a lot to you. I will get you a

16

new one.'  As if buying a new dog will somehow replace Charlie, somehow fix what Ms. Dalton had just experienced that day.  Ms. Dalton, she asked him, 'Can you help me get this dog out of the car, help me with the dog?'  [¶]  [He responds,] 'Right now I am about to go to sleep, so call me in the morning.  I will come help you.  All right.  I am going to go to bed.'  [¶]  Take care of your problems.  I will just chill at [Tracy's] house; right, not even his own house.  Have some fun right after I tried to kill the mother of my two children."

In rebuttal argument, the prosecutor said:  "You don't duck unless something is pointed at you.  The thing being pointed, it's a firearm.  That let us know the gun was pointed at her [i.e., A.W.], and if the gun is pointed at her, that informs us of what the defendant was trying to do.  Right? [¶]  It's logically inconsistent with, why he would want to kill the mother of his children.  If he cares about her so much, ladies and gentlemen—not really a nice way to say this—but why do you then, only maybe four or five hours later, go . . . 'bang' somebody else's friend, or in his words, 'go fuck some other bitches.' Right?  If you care about someone so much, that should not be the response that you have to this type of event.  He was clearly done with her.  That's why he hooked up with her friend, literally hours after this happened with a person he barely knows, who he's been messaging over Facebook. [¶]  That's the mental state of the defendant.  He doesn't care about her."

B.  *Applicable Legal Principles*

1.  *Prosecutorial Misconduct*

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.  Furthermore, and particularly pertinent here, when the claim focuses upon

17

comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

"At closing argument a party is entitled both to discuss the evidence and to comment on reasonable inferences that may be drawn therefrom." (*People v. Morales*, *supra*, 25 Cal.4th at p. 44.) "Within the scope of permissible prosecutorial argument, a prosecutor is given wide latitude during argument ' " ' "as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. . . ." ' " ' " (*People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1529.) " 'A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury.' " (*People v. Tully* (2012) 54 Cal.4th 952, 1021; see *People v. Bandhauer* (1967) 66 Cal.2d 524, 529 [a prosecutor "may vigorously argue his case and is not limited to 'Chesterfieldian politeness' "].)

"As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) "A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile." (*People v. Hill* (1998) 17 Cal.4th 800, 820.)

### 2. *Ineffective Assistance of Counsel*

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) To show prejudice, defendant must show that there is a

18

reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland,* at pp. 693-694; *Ledesma,* at pp. 217-218.) " A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*Ledesma*, at p. 218.)

    C. *Analysis*

        1. *Prosecutorial Misconduct*

Defendant neither objected to the remarks made by the prosecutor in closing argument which he now asserts constitute misconduct, nor did he ask the trial court to admonish the jury regarding the remarks. He has therefore forfeited his prosecutorial misconduct claim. (*People v. Riggs* (2008) 44 Cal.4th 248, 298; *People v. Panah* (2005) 35 Cal.4th 395, 462.) " 'The purpose of the rule requiring the making of timely objections is remedial in nature, and seeks to give the [trial] court the opportunity to admonish the jury, instruct counsel and forestall the accumulation of prejudice by repeating improprieties, thus avoiding the necessity of a retrial.' " (*People v. Brown* (2003) 31 Cal.4th 518, 553.) By failing to object, defendant did not give the trial court an opportunity to address his objection and remedy any resulting prejudice.

Recognizing that there was no objection to the challenged remarks, defendant argues there was no forfeiture because any objection would have been futile. In support of this argument, defendant points to several statements made by the trial court prior to closing argument. In proceedings outside the presence of the jury, the court advised the parties how it intended on proceeding during argument if one of the attorneys objected on the ground that the evidence had been misstated. The court stated, "I tell [the jury that] if someone objects, hey, judge that misstates the evidence, I tell them, rely on their memories. If it's important to them, the court reporter can read it back. We can't slam the breaks on and go back two or three days and disrupt the flow of your arguments."

We do not read these comments to suggest the trial court would not have entertained timely objections to prosecutorial misconduct; instead, the court was

19

announcing its intended admonishment to the jury if one counsel objected to the other misstating the record. We cannot conclude from this or anything else in the record that an objection would have been futile.

### 2. *Ineffective Assistance of Counsel*

We reject defendant's alternative contention that trial counsel rendered ineffective assistance by failing to object. The prosecutor was permitted to comment on the evidence giving rise to the inference that defendant had sexual relations with A.W.'s friend shortly after the shooting. The evidence adduced at trial supported the inference. Defense counsel was not deficient in choosing not to object and thereby potentially emphasizing the evidence that was in his client's best interest to minimize. Moreover, defendant has not shown prejudice.

The critical issues at trial were whether defendant threatened A.W. and Dalton, whether he assaulted them with a firearm, and whether he intended to shoot and kill A.W. As we have explained, we will reverse defendant's conviction for threatening Dalton (count 5); the counts charging defendant with the attempted murder of A.W. (count 1) and assaulting Dalton with a firearm (count 4) were dismissed at the prosecutor's request after the jury failed to reach a unanimous verdict. The evidence supporting defendant's guilt on the remaining counts--threatening A.W. (count 3) and assaulting her with a firearm (count 2)--was strong compared to the evidence supporting a contrary result. Indeed, defense counsel conceded in closing argument that defendant fired one round from a shotgun in the direction of A.W. while she was nearby. Defense counsel also conceded that A.W. "mostly lied" during her testimony, and the evidence adduced at trial showed that she was not a credible witness about defendant's conduct on the night of the shooting, including her claim that he did not threaten her or point a gun at her, which directly contradicted Dalton's testimony. Defense counsel further conceded that defendant was guilty on the counts charging him with cruelty to an animal (§ 597, subd. (a); count 6), discharging a firearm in a grossly negligent manner (§ 246.3, subd. (a);

20

count 7), and vandalism (§ 594, subd. (b)(2)(A); count 8). Finally, defense counsel admitted that defendant falsely told a police officer that his name was Roy after he was arrested.

Under these circumstances, we cannot conclude that defendant would have obtained a more favorable result absent the alleged deficient performance of trial counsel in failing to object to the challenged portions of the prosecutor's argument.

## DISPOSITION

Count 5 is reversed. Sentence is vacated and the matter is remanded to the trial court for resentencing. In all other respects, the judgment is affirmed. Following resentencing, the trial court is directed to prepare an amended abstract of judgment and to forward a certified copy thereof to the Department of Corrections and Rehabilitation.

/

_____/s/_____
Duarte, J.

We concur:

_____/s/_____
Blease, Acting P. J.

_____/s/_____
Renner, J.

21